Frank L. HUFF et al., Plaintiffs,

v.

SECRETARY OF the NAVY et al., Defendants.

Civ. A. No. 75–0043.

United States District Court, District of Columbia.

May 21, 1976.

Alan Dranitzke, Forer & Rein, David F. Addlestone, Susan H. Hewman, Washington, D. C., for plaintiffs.

Earl J. Silbert, U. S. Atty., Robert N. Ford, Derek I. Meier, Asst. U. S. Attys., Washington, D. C., for defendants.

## MEMORANDUM OPINION

PARKER, District Judge.

This proceeding presents questions for judicial determination regarding the limit and scope of constitutional rights afforded to members of the military, a subject which the courts have frequently considered in recent years. Here, three individual plaintiffs, on behalf of themselves and other members of the Marine Corps stationed at, assigned to or on duty at the Marine Corps Air Station at Iwakuni, Japan, challenge certain regulations which require prior command approval for distribution of written material by military personnel. They seek declaratory and injunctive relief against the Secretary of the Navy and certain military

officers with respect to the implementation and enforcement of the regulations.

The Court is called upon to resolve cross-motions for summary judgment and, having considered the memoranda of counsel, affidavits, exhibits, oral argument, and the entire record, concludes that plaintiffs' motion should be granted in part and denied in part, for the reasons which follow.

### First Amendment in the Military

In *Parker v. Levy,* 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974), the Supreme Court left no doubt as to the guiding principle to be observed:

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for the imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside of it. 417 U.S. at 758, 94 S.Ct. at 2563, 41 L.Ed.2d at 459.

Despite the tone of this oft-quoted passage, many jurists have questioned this generalization and have taken the view that the mandates of the Constitution are fully applicable to the military, and would place the burden of justification upon those attempting to restrict freedom of expression. As Supreme Court Justice William J. Brennan recently noted:

> . . . the First Amendment does not evaporate with the mere intonation of interests such as national defense, military necessity, or domestic security. . . . In all cases where such interests have been advanced, the inquiry has been whether the exercise of First Amendment rights necessarily must be circumscribed in order to secure those interests. *Greer v. Spock,* —— U.S. ——, 96 S.Ct. 1211, 1224, 47 L.Ed.2d 505, 523, 44 U.S.L.W. 4380, 4388 (1976) (Brennan, J., dissenting).

The view that an assertion of constitutional rights is a threat to discipline and morale in the military has been sharply questioned. Perhaps encouragement of more freedom of thought would have sparked recognition of unlawful orders in the Vietnam War, and prevented atrocities such as the massacre of civilians at My Lai. Scientific studies have also pointed out that too much discipline among service personnel can lead to increased susceptibility to brainwashing techniques while in captivity.[1] The military, too, are members of the American society where freedom of expression is a key value, and they are fully capable of reconciling a dissenting personal viewpoint with a duty to obey the law. This was clearly recognized by Chief Judge David Bazelon when he wrote:

> . . . soldiers like other citizens can disagree with governmental policy and yet still realize that they must follow the legal requisites of that policy, including military service, until the policy is changed by democratic means. *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327, 1337 (1975) (Bazelon, dissenting).

Thus, in examining the facts and issues in this proceeding, the Court will assume that constitutionally guaranteed liberties are to be respected, unless there is a demonstrated need which justifies military restrictions on free expression.

### Factual Background

The plaintiffs Frank L. Huff, Robert A. Falatine, and Robert E. Gabrielson allege that while stationed at the Marine Corps Air Station, Iwakuni, Japan, they were unlawfully denied permission to circulate petitions to Congress and to distribute certain printed material, both on and off base. Early in the proceedings the matter was certified as a class action "on behalf of all members of the Marine Corps stationed at,

---

1. Note, "Military Discipline and Political Expression: A New Look at an Old Bugbear," 6 *Harv.Civ.Rights-Civ.Lib.L.Rev.* 525, 541 (1971).

assigned to, or on duty at the Marine Corps Air Station at Iwakuni, Japan."[2]

The plaintiffs' purpose in bringing this class action was to challenge the validity of the regulations which required them to obtain permission to distribute the written materials in question. The questioned regulations[3] provide in pertinent part as follows:

5.2(2) No member of this command will originate, sign, distribute, or promulgate petitions, publications, including pamphlets, newspapers, magazines, handbills, fliers, or other similar printed or written materials on board any ship, craft, aircraft, or in any vehicle of the Department of the Navy, or aboard any military installation, while in a duty status or non duty status, in uniform or out of uniform, or anywhere within a foreign country, regardless of uniform or duty status unless prior command approval is obtained.

5.c. . . . Commanders will control or prohibit the unauthorized activities described, if, in their judgment activity would,

(1) Materially interfere with the safety, operation, command or control of his unit, or the assigned duties of particular members of the command; or,

(2) Present a clear danger to the loyalty, discipline, morale or safety to personnel of his command; or,

(3) Involve distribution of material or the rendering of advice or counsel that causes, attempts to cause, or advocates insubordination, disloyalty, mutiny, refusal of

duty, solicits pornographic material, or comprises, advocates, or solicits violation of international treaties or agreements; or,

(4) Involve the planning or perpetration of an unlawful act or acts.

(hereinafter "the regulations").

The defendants are the Secretary of the Navy and military officers[4] responsible for prescribing and administering the regulations.

Plaintiffs seek by this action: (1) a declaration that the regulations are unconstitutional on their face or as applied in violation of the First and Fifth Amendments to the United States Constitution, 10 U.S.C. § 1034[5] and pertinent Marine Corps guidelines (hereafter "guidelines");[6] (2) an injunction and mandamus order restraining defendants from continuing to deny plaintiffs their rights; and (3) invalidation and expungement of plaintiff Huff's conviction and plaintiff Falatine's arrest for violating said regulations, and restoration of all pay, benefits and rank of which Huff was deprived as a result of said conviction.

### Specific Actions Taken Against The Individual Plaintiffs

Their complaint revolves around four specific denials of requests to circulate written materials and one incident where two of the plaintiffs were arrested for circulating a letter without requesting approval.

On May 2, 1974, plaintiff Huff requested permission to distribute both on and off

---

**2.** Order filed July 17, 1975, pursuant to Rule 23(a) Fed.R.Civ.P.

**3.** First Marine Aircraft Wing Order 5370.1A, replaced by 5370.1B and Marine Corps Air Station (Iwakuni, Japan) Order 5370.3A, replaced by 5370.3B; Fleet Marine Force Pacific Order 5370.3 and Commander-In-Chief, Pacific Fleet Instruction 5440.3C, all of which contain essentially the same provisions.

**4.** Commandant of the Marine Corps, Commander-in-Chief U.S. Pacific Fleet, Commanding General Fleet Marine Force Pacific, Commanding General First Marine Aircraft Wing and Commanding Officer U.S. Marine Corps Air Station.

**5.** The text of 10 U.S.C. § 1034 in its entirety reads as follows:

No person may restrict any member of an armed force in communicating with a member of Congress, unless the communication is unlawful or violates a regulation necessary to the security of the United States.

**6.** Department of Defense Directives 1325.6 and 1344.10; OPNAV Instruction 1620.1 and MCO 5370.4. The basic policy expressed in the guidelines is that "the service member's right of expression should be preserved to the maximum extent possible, consistent with good order and discipline and the national security." DOD Directive 1325.6, Part II.

base, a petition to Senator Alan Cranston regarding the use of members of the military and the National Guard in labor disputes, and copies of an article on the use of Article 138 of the Uniform Code of Military Justice.[7] Permission was denied by the Commanding General, on the basis that the petition contained "gross misstatements and implications of law and fact as well as impugning by innuendo the motives and conduct of the Commander-in-Chief of the Armed Forces in the exercise of his constitutional responsibilities."

On May 8, 1974, plaintiff Falatine requested permission to distribute for signatures a petition, either on or off base, to Congressman Ronald Dellums supporting amnesty for Vietnam War resisters. His requests were denied for the same reasons the Huff request was denied.

On June 24, 1974, both Falatine and Huff requested permission to circulate copies of a leaflet entitled "We Hold These Truths To Be Self-Evident (But Do the Brass?)" containing the Declaration of Independence and the First Amendment to the Constitution, with commentary. Huff requested permission to distribute the leaflet off-base while Falatine's request was for on-base circulation. Huff's off-base request was granted, but Falatine's on-base proposal was denied because the leaflet's introductory paragraph was deemed to be "by transparent implication, disrespectful and contemptuous of all of your superiors, officers, noncommissioned officers and civilians alike."

On July 12, 1974, these two plaintiffs and several other Marines were displaying outside the main gate of the Air Station, a copy of a letter to Senator J. William Fulbright concerning United States support for the government of South Korea. They were immediately arrested for unauthorized distribution of written materials in violation of the regulations. Huff was court-martialed, sentenced to 60 days at hard labor, forfeiture of half-pay, and reduction in rank from E–3 to E–1, the lowest enlisted grade. Court-martial proceedings against Falatine were dismissed due to lack of evidence, but his arrest still appears as a part of his military record.

Subsequent to the arrests of Huff and Falatine, plaintiff Gabrielson requested permission to distribute the same Fulbright letter as well as a statement concerning the July 12 arrests of Huff, Falatine and others. Gabrielson was given permission to distribute the letter and accompanying statement on base, but not in the barracks, on the condition that no argument or debate of the issue would accompany the distribution. Permission to circulate the materials outside the main gate of the base was denied, however, because it would constitute "a form of political activity within the host country" in violation of the Status of Forces Agreement between the United States and Japan.[8] Both Huff and Falatine also requested permission to circulate the petition and leaflet, and their requests were also granted for on-base distribution only.

Plaintiffs argue that despite the special constitutional restrictions imposed by virtue of the military situation, they are nonetheless entitled to have the regulations at issue here invalidated both on their face and as applied to plaintiffs in the instances detailed above.

### Facial Validity of the Regulations

The Marine regulations applied against these plaintiffs are nearly identical to the Air Force regulations requiring prior approval for distribution of publications that were discussed in *Carlson v. Schlesinger,* 167 U.S.App.D.C. 325, 511 F.2d 1327 (1975).

---

**7.** Article 138, 10 U.S.C. § 938, provides for the filing of complaints by armed forces personnel against a commanding officer.

**8.** Article XVI of the Status of Forces Agreement between the United States and Japan reads as follows:

It is the duty of members of the United States armed forces, the civilian component, and their dependents to respect the law of Japan and to abstain from any activity inconsistent with the spirit of this Agreement, and, in particular, from any political activity in Japan.

11 U.S.T. 1664, T.I.A.S. 4510.

Although the majority in *Carlson* "entertain[ed] significant doubts about the breadth and scope of the regulations," they did not reach the facial validity issue because the regulations were upheld as applied to servicemen who sought to distribute anti-war materials in a combat zone. The Supreme Court, however, recently held that Army regulations requiring prior approval for on-base distribution of political materials "are not constitutionally invalid on their face." *Spock v. Greer, supra,* —— U.S. at ——, 96 S.Ct. at 1217, 47 L.Ed.2d at 514, 44 U.S.L.W. at 4383. The standards for disapproval, "clear danger to the loyalty, discipline or morale of the troops" were also approved in the *Spock* ruling. Therefore, this Court must carefully examine the circumstances under which the restrictions were applied to plaintiffs and determine whether military necessity warranted the particular applications of the regulations in this case.

### Validity of Regulations As Applied On-Base

The general rule in this Circuit is that the Supreme Court's constitutional standards shall govern "unless it is shown that conditions peculiar to military life require a different rule." *Kauffman v. Secretary of the Air Force,* 135 U.S.App.D.C. 1, 415 F.2d 991, 997 (1969), *cert. denied* 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970). The task of this Court, therefore, is to "strike the

proper balance between legitimate military needs and individual liberties." *Carlson, supra,* at 1331.[9] The *Carlson* majority held that the requirement of absolute discipline in a combat mission fully justified the prior approval requirement for circulating petitions. Likewise, in *Spock* it was held that prior approval for on-base distribution of political literature at Fort Dix, New Jersey was valid because of the "military interest in preserving a relatively isolated sanctuary" during the basic training period,[10] and the maintenance of "a politically neutral military establishment under civilian control" which is "wholly free of entanglement with partisan political campaigns of any kind."[11]

In the present case, however, prior approval was required for on-base distribution among servicemen of petitions to Congress and other materials on political topics of interest to United States citizens. The base in question is located in Japan, and although it may be "combat-ready"[12] this is clearly not a combat zone case as in *Carlson*. Nor are the Marines at Iwakuni involved in basic training, as in *Spock* where separation from the political sphere was deemed to be of particular importance.[13] On the contrary, American servicemen stationed in a foreign country have even less access to information and ideas concerning domestic politics than the soldiers in boot camp who are free to attend rallies and receive information from civilian, off-base sources. Therefore, the need to assure a

**9.** *See also, Glines v. Wade,* 401 F.Supp. 127, 130 (N.D.Cal.1975) ("the latitude to be permitted in prescribing regulations varies with the magnitude of the governmental or military interest involved.")

**10.** Spock, *supra,* at ——, 96 S.Ct. at 1223, 47 L.Ed.2d at 521, 44 U.S.L.W. at 4384 and 4386 (Powell, concurring).

**11.** *Id.,* at ——, 96 S.Ct. at 1218, 47 L.Ed.2d at 515, 44 U.S.L.W. at 4383 (majority opinion).

**12.** Affidavit of Lt. Gen. Leslie E. Brown, U. S. Marine Corps, filed as defendant's Exhibit A. This "post-hoc" litigation affidavit attempts to rationalize the broad sweep of these regulations as applied to limited on-base activities by relying on the fact that Marines at Iwakuni

must be prepared for deployment into combat at any time. A similar affidavit prepared to justify another Iwakuni regulation restricting individual liberties was held by our Circuit Court to be insufficient to foreclose discussion of the opposing factual claims raised by plaintiffs. *Hess v. Schlesinger,* 159 U.S.App.D.C. 51, 486 F.2d 1311 (1973).

**13.** Defendants also rely on the case of *Committee for GI Rights v. Callaway,* 171 U.S.App.D.C. 73, 518 F.2d 466 (1975). The "poster regulation" prohibiting display of posters on barracks walls without prior command approval was upheld in the context of an overall drug abuse program instituted by the Army in response to a drug problem on European Army bases. The situation at Iwakuni is thus not comparable.

free flow of information and ideas is crucial in the foreign base situation.

In addition, three of the four publications involved in this case were petitions or letters addressed to members of Congress. The right to petition the government for redress of grievances is specifically guaranteed by the First Amendment. Congress has provided special protection of the serviceman's rights in this area, by the enactment of 10 U.S.C. § 1034.[14]

The standards used in the incidents cited by plaintiffs, however, meet neither the constitutional[15] nor the Congressional standard. For instance, plaintiff Huff's request to distribute for signatures in his barracks a petition to Senator Alan Cranston regarding the use of the military and National Guard in labor disputes was denied because it contained "gross misstatements . . . impugning by innuendo the motives and conduct of the Commander-in-Chief . . . ." Plaintiff Falatine's request to distribute a petition addressed to Congressman Ronald Dellums in support of amnesty for Vietnam War resisters was denied for the same reason Huff's petition was denied. Finally, Falatine's request to distribute on-base a leaflet commenting on the Declaration of Independence and the First Amendment was denied because "the introductory paragraph is, by transparent implication, disrespectful and contemptuous of all your superiors, officers, noncommissioned officers and civilians alike." Plaintiff Huff's request to distribute the same leaflet off-base, however, was granted simultaneously with the denial of Falatine's request.

It is clear to this Court from these undisputed facts that plaintiffs' requests were denied on the basis of the *content* of the petitions and leaflets, rather than legitimate military security requirements. Indeed, defendants conceded in their memorandum of points and authorities (at p. 3) that in all three of these instances, the

denials were based on criteria other than "clear danger to loyalty, discipline and morale" or material interference with the accomplishment of the mission, as set forth in the regulations.

In this Court's opinion, not only were the denials arbitrary misapplications of the regulations, but the very system of prior restraints for serviceman-to-serviceman distribution of materials on-base during off-hours and away from restricted or work areas, is unconstitutionally restrictive of First Amendment freedoms.

Two other district courts have recognized the right of military personnel to distribute written materials among themselves, without first securing prior clearance from a commanding officer. In *Glines v. Wade*, 401 F.Supp. 127 (N.D.Cal.1975), the Court held that comparable Air Force regulations were unconstitutional as applied to petitioning activities which occurred during a routine training flight to Anderson Air Force Base in Guam. The *Glines* case held that the military interest in restricting distribution of petitions during peacetime in a non-combat area was "relatively insubstantial." *Id.* at 130. There is a chilling effect involved in requiring prior approval for distribution in situations where the threat to security is minimal, which is "particularly apparent in a military setting, where petitions addressed to members of Congress are very likely to involve complaints about military policies or about the administration of military affairs by superior officers." *Id.* at 131.

Similarly, in *Allen v. Monger*, 404 F.Supp. 1081 (N.D.Cal.1975), enlisted members of the United States Navy stationed on two aircraft carriers sought to distribute petitions to Congress concerning objections to assignments in the Far East. The District Court in California held that the Naval Regulations requiring prior approval of on-ship distribution of petitions to Congress

---

**14.** *See* note 5, *supra*.

**15.** In *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), the Supreme Court held that "a law subjecting the exercise of First Amendment freedoms to

the prior restraint of a license, without narrow, objective and definite standards to guide the licensing authority, is unconstitutional." *Id.* at 150–51, 89 S.Ct. at 938, 22 L.Ed.2d at 167.

constituted an overbroad prior restraint on protected activities and as such, were unconstitutional. The requirement of prior approval might well deter some persons from circulating legitimate petitions out of "real or imagined fear of reprisal." *Id.* at 1087. The *Allen* opinion went on to hold, however, that while pre-screening of petitions to be distributed on board ship is unconstitutional outside a combat area, the Navy may issue regulations concerning the time, place and manner of distribution.

Likewise, in this case, the military interest in restricting on-base distributions among service personnel in a non-combat area is minimal, and is outweighed by the individual's interest in free speech. Establishing lines of communication among servicemen is especially important on bases in foreign countries which may have more restricted access to civilian sources of ideas than their counterparts in the States.

■ Of course, as it was pointed out in the *Carlson* case, military officials may regulate the "time, place and manner" of First Amendment activity. 511 F.2d at 1331. The regulations in this case, however, require prior command approval for all distributions and thus unduly restrict First Amendment activity without the requisite showing of military need. Therefore, the regulations are unconstitutional as applied to on-base distribution of written materials. Regulations which allowed such activity without prior approval only during off-hours and in recreational or public areas of the base would, of course, be reasonable.

### Validity of Regulations As Applied Off-Base

Off-base petitioning presents a somewhat different problem due to unique conditions prevailing for American armed service personnel stationed in foreign countries. As mentioned above, the political activities of Marines at Iwakuni are restricted by the Status of Forces Agreement [16] which prohibits members of the United States Armed Forces from engaging in any political activity in Japan.

Two instances of off-base petitioning are involved in this case, which the government alleges were prohibited by virtue of the Agreement. On July 12, 1974, Huff and Falatine were arrested by military police, while circulating off-base a letter to Senator Fulbright protesting United States support of South Korea. Huff was court-martialed and convicted but the charges against Falatine were dropped. In late July and early August, 1974, all three plaintiffs requested permission to distribute the same letter and a statement regarding the previous arrests. Permission was granted as to on-base distribution, but denied for off-base.

■ Since the political activities of the Marines are restricted by an international agreement, it is not unreasonable to require prior approval for off-base petitioning. In this area, the military has demonstrated a substantial interest in pre-screening written materials, just as they were able to demonstrate a special interest in regulating petitioning in combat zones, *Carlson, supra,* and in boot camp, *Spock, supra.* Judge John Pratt of this Court recently ruled that "the exigencies and considerations attendant to service in a foreign country" justified a prohibition against demonstrations by members of the armed forces while serving abroad. *Culver v. Secretary of the Air Force,* 389 F.Supp. 331, 334 (D.D.C.1975) (off-base demonstration).

The letter to Senator Fulbright was concerned with an issue which was very controversial in internal Japanese politics at that time. Two Japanese students were facing courts-martial in South Korea, and demonstrations were taking place in Japan to protest the policies of the South Korean president.[17] Thus, the Commanding Gener-

---

16. *See* note 8, *supra.*

17. These manifestations of Japanese involvement and concern regarding the policies of the South Korean government were mentioned in the Fulbright letter and accompanying statement. *See* Defendants' Exhibit F, Nos. 61 and 62. *See also* newspaper articles contained in Defendants' Exhibit J.

al who denied permission for off-base distribution had a valid basis for doing so because, under the circumstances, the letter and accompanying statement could have been interpreted to be a form of interference in internal Japanese politics. The effect of the off-base prohibition was also alleviated by the fact that plaintiffs were allowed to distribute their petitions within the boundaries of the American military base, so that an alternate forum was provided in which plaintiffs could reach their fellow Marines.

The prior approval restriction on off-base distributions is constitutional because of the military's need to assure that international agreements are obeyed. Thus, it would be inappropriate for this Court to overturn plaintiff Huff's conviction or to expunge the arrest records of Huff and Falatine, who were arrested for *off-base* distribution without prior approval. Had they been arrested within the gates of the Marine base, or had the military officials failed to provide an alternate on-base forum for expression in this instance, then the case for expungement would have been stronger. Under the present state of the law, however, courts cannot order expungement for an admitted violation of a constitutionally valid regulation.[18]

Counsel for the plaintiffs will submit an appropriate order in conformance with the foregoing opinion by May 26, 1976.

---

**18.** In *Sullivan v. Murphy,* 156 U.S.App.D.C. 28, 478 F.2d 938, 968, *cert. denied,* 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (1973), our Circuit Court held that expungement of arrest records was an "appropriate remedy in the wake of police action in violation of constitutional rights." It follows that this remedy is inappropriate where plaintiffs have failed to show a constitutional violation.